UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RODNEY PICOTT and DOUGLAS HARLE,

                         Plaintiffs,

- against -

SARA CHATMON, CHRIS GIACOPELLI, CAPTAIN ANTHONY OVCHINNIKOFF, Individually, CHIEF MICHAEL SULLIVAN, Individually and in his official capacity, FORMER CHIEF PETER NOONAN, Individually and in his official capacity, ROBERT MAHON, Individually and in his official capacity, and the TOWN OF CLARKSTOWN,

                         Defendants.

**OPINION AND ORDER**

12 Civ. 7202 (ER)

Ramos, D.J.

Rodney Picott[1] brings this action against Captain Anthony Ovchinnikoff, Chief Michael Sullivan, Former Chief Peter Noonan, Patrol Captain Robert Mahon, and the Town of Clarkstown Police Department (together, the "Clarkstown Defendants"), and Sara Chatmon and Chris Giacopelli. Plaintiff asserts claims for false arrest and malicious prosecution pursuant to 42 U.S.C. § 1983 and New York state law, as well as a *Monell* claim against the Town of Clarkstown. Pending before the Court are Defendants' unopposed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Docs. 84, 102.

For the reasons discussed below, Defendants' motions for summary judgment are GRANTED.

---

[1] This matter was originally filed by both Picott and Douglas Harle. By Opinion and Order dated September 25, 2013, the Court severed Picott's claims from those of Harle. Doc. 32.

**I.     Factual Background**

Plaintiff has been a police officer for the Town of Clarkstown for more than 25 years. Clarkstown Defs.' Ex. F, 7:7–9.  During the relevant time period, the Clarkstown Defendants were members of the Clarkstown Police Department:  Anthony Ovchinnikoff was a lieutenant, Peter Noonan was the Chief of Police, Robert Mahon was the Operations Captain, and Michael Sullivan was the Administrative Captain.  Am. Compl. ¶¶ 16, 17, 24; Doc. 111 ¶¶ 114–117.

On July 16, 2010, Plaintiff was involved in a domestic violence incident with his girlfriend, Diana Mlavets.  Clarkstown Defs.' 56.1 ¶¶ 4–5.  Mlavets reported the incident to law enforcement, including the Clarkstown police, but did not file a formal complaint.  *Id*. ¶¶ 6, 8. Mlavets was accompanied by Sara Chatmon when she reported the incident to law enforcement. *Id* ¶ 8.  Mlavets and Chatmon worked together at Buy Rite Liquors, which was owned by Chris Giacopelli.  Am. Compl ¶ 39.  Later that day, another incident took place between Plaintiff and Mlavets outside of Buy Rite Liquors.  According to Mlavets, Plaintiff got in his car and began to drive away while Mlavets was holding on to the car, causing her to fall to the ground. Clarkstown Defs.' 56.1 ¶¶ 13–18.  Giacopelli and Chatmon were inside the store when the incident took place, but came out to assist Mlavets when she called out to them.  *Id*. ¶ 22. Plaintiff heard Chatmon yell at Giacopelli to call the police, and was concerned that "they would make bigger problems" for him.  *Id*. ¶ 22.  Mlavets went to the Clarkstown Police Department to report the incident, again accompanied by Chatmon.  Chatmon and Giacopelli's 56.1 ¶ 10. Mlavets later changed her account of the incident and told police that she did not wish to press charges against Plaintiff.  Clarkstown Defs.' 56.1 ¶ 31.

On August 13, 2010, Lieutenant Pendergrast of the Clarkstown police interviewed Chatmon about the July 16, 2010 incident.  *Id*. ¶ 34.  Chatmon told Pendergrast that Plaintiff told

her boss that "there was gonna be some type of revenge" against Chatmon because she had helped Mlavets. Clarkstown Defs.' Ex. M at p. 9. Chatmon told Lieutenant Pendergrast that she needed an order of protection against Plaintiff. *Id*. Chatmon later testified that after she heard about Plaintiff's alleged threats, she called the Clarkstown police to report the threats and an officer told her to go to the police station. Clarkstown Defs.' Ex. O, pp. 115–116. When she arrived at the police station, she told an officer—possibly Ovchinnikoff—that Plaintiff had threatened her and that she needed an order of protection. *Id*. It is unclear from the record whether this conversation was separate from Chatmon's conversation with Pendergrast on August 13, 2010. *Id*.

On August 31, 2010, Pendergrast and Ovchinnikoff interviewed Giacopelli about the July 16, 2010 incident and Plaintiff's alleged threats towards Chatmon. Clarkstown Defs.' 56.1 ¶ 42. Giacopelli told the officers that Plaintiff "was accusin' [Chatmon] of causin' this whole problem between him and [Mlavets]" and said that "we'll see what happens . . . she drew first blood now." Defs.' Ex. N, p. 5. Ovchinnikoff asked Giacopelli if he took Plaintiff's words to be a threat against Chatmon, and Giacopelli answered that he did. *Id*. at 7.

Ovchinnikoff also spoke with Greg Vedovato, Chatmon's co-worker. Clarkstown Defs.' Ex. P. According to Vedovato, Plaintiff told him that "he was very angry at Sara Chatmon because Chatmon was the cause of all the problems he was having." *Id*. Vedovato said that Plaintiff "went from a very calm voice and demeanor to very angry and full of rage when he began to speak of Chatmon" and that "the tone of [Plaintiff's] conversation concerned him and that he took it as threatening and relayed this to Chatmon." *Id*. Vedovato told Ovchinnikoff that "if Chatmon was his sister he would be afraid and would want her to get an order of protection." *Id*.

3

On August 31, 2010, Ovchinnikoff asked an Assistant District Attorney ("ADA") whether she thought that the "third party statements [of Chatmon, Giacopelli, and Vedovato] were enough to constitute a harassment charge and an order of protection request" against Plaintiff. *Id*. The ADA felt that they were sufficient. *Id*. The record suggests that following his conversation with the ADA, Ovchinnikoff drafted a complaint, known as a "Violation Information," for Chatmon to sign. Chatmon signed the complaint on September 1, 2010, declaring that Plaintiff had made "threatening and intimidating statements" about her to Giacopelli and Vedovato. Giacopelli and Vedovato signed "Supporting Depositions" affirming the accuracy of Chatmon's complaint. *Id*.

Plaintiff was arrested on September 1, 2010 and was charged with harassment in the second degree.[2] Clarkstown Defs.' Ex. U, Ex. P. Ovchinnikoff was the arresting officer. *Id*. That same day, a judge granted Chatmon an order of protection against Plaintiff. Clarkstown Defs.' 56.1 ¶ 48. The charges against Plaintiff were dismissed on September 24, 2011. Am. Compl. ¶ 103.

## II. Procedural Background

Picott filed this action together with a fellow Clarkstown police officer, Douglas Harle, on September 24, 2012. Doc. 1. Picott brought claims of false arrest and malicious prosecution under 42 U.S.C. § 1983 and New York state law against the Clarkstown Defendants, Chatmon, and Giacopelli. While only Ovchinnikoff was directly involved in Plaintiff's arrest and prosecution, Plaintiff claims that Noonan, Sullivan, and Mahon were liable because they (1) were Ovchinnikoff's supervisors, (2) were "in a position to intervene and prevent [Plaintiff's]

---

[2] Under New York law, "a person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person: (1) he or she strikes, shoves kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; or (2) he or she follows a person in or about a public place or places; or (3) he or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose." N.Y. Penal Law § 240.26.

4

unlawful arrest and prosecution," and (3) failed to do so. Am. Compl. ¶¶ 86–94. Picott claims that Chatmon and Giacopelli are also liable because they "conspired [with Ovchinnikoff] to violate Picott's civil rights and have him falsely arrested [and] maliciously prosecuted." Am. Compl. ¶ 78.

Harle alleged violations of his First and Fourth Amendment rights, as well as state law claims, based on unrelated incidents. Doc. 1. Both Picott and Harle also alleged a *Monell* claim against the Town of Clarkstown, which they alleged had a custom and policy of "allowing and permitting constitutional violations of targeted police officers by other officers and supervisors at the Clarkstown police department." Doc. 1. Harle and Picott filed an Amended Complaint on November 9, 2012. Doc. 4.

Defendants filed a motion to sever on February 21, 2013. Doc. 17. The Court found that Picott's and Harle's claims should have been brought as separate actions and granted the motion on September 25, 2013. Doc. 32.

Picott and Harle were originally represented by the same attorney, Michael H. Joseph. Doc. 1. Mr. Joseph moved to withdraw as Picott's counsel on January 13, 2015. Doc. 53. On January 26, 2015, Magistrate Judge Lisa Smith granted Mr. Joseph's motion to withdraw and gave Picott 90 days to obtain new counsel. Doc. 59. However, Picott did not obtain new counsel and has proceeded *pro se* during the remainder of the litigation.

On September 16, 2016, the Clarkstown Defendants and Chatmon and Giacopelli filed separate motions for summary judgment. Docs. 84, 102. Picott's opposition was due on October 17, 2016. Doc. 119. Picott failed to file any opposition papers by that deadline. *Id*. On August 22, 2017, the Court issued an order directing Picott to file an opposition by September 5, 2017,

or otherwise the Court would decide Defendants' motions on the basis of the papers already submitted. *Id*. The Court has not received any opposition papers from Plaintiff.

### III. Legal Standard on Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)) (internal quotation marks omitted). In determining whether summary judgment is appropriate, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).

In situations in which a motion for summary judgment is unopposed, the Court may only grant summary judgment if it determines that the moving party is entitled to judgment as a matter of law. *See, e.g.*, *Vermont Teddy Bear Company, Inc. v. 1–800 Beargram Company*, 373 F.3d 241, 244 (2d Cir. 2004) ("This Court has made clear, however, that where the non-moving party chooses

the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.") (internal quotation marks and citation omitted); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) ("Even unopposed motions for summary judgment must fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law.") (internal quotation marks and citation omitted).

      The Second Circuit has made clear that "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)). *Pro se* litigants' submissions are "held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Young v. N.Y.C. Department of Education*, No. 09 Civ. 6621, 2010 WL 2776835, at *5 (S.D.N.Y. July 13, 2010) (noting that the same principles apply to briefs and opposition papers filed by *pro se* litigants). Although "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law,'" *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), courts read the pleadings and opposition papers submitted by *pro se* litigants "liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (citation omitted). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

7

## IV. Discussion

### A. <u>Plaintiff's Claims Against Ovchinnikoff</u>

#### i. *False Arrest Pursuant to § 1983*

Plaintiff contends that Ovchinnikoff is liable for false arrest pursuant to § 1983 because Ovchinnikoff lacked "probable cause to believe that Plaintiff had committed the violation of harassment." Am. Compl. ¶ 85. "[A Section] 1983 claim for false arrest derives from the Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). To establish a claim for false arrest under § 1983, a plaintiff must prove: (1) that the defendant intentionally confined plaintiff; (2) that plaintiff was conscious of the confinement, (3) did not consent to it, and (4) that the confinement was not otherwise privileged. *See Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451 (1975)).

Ovchinnikoff does not contest that Plaintiff has properly alleged the first three elements of his false arrest claim. Thus, the only disputed element is whether the arrest was otherwise privileged; *i.e.*, whether Ovchinnikoff had probable cause to arrest Plaintiff. If Ovchinnikoff had probable cause to arrest Plaintiff, then the confinement is privileged and constitutes a complete defense to a false arrest claim. *Covington v. City of N.Y.*, 171 F.3d 117, 122 (2d Cir. 1999) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d. Cir. 1996)); *see also Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (noting that to avoid liability for a claim of false arrest, an arresting officer may demonstrate that he had probable cause for the arrest).

The existence of probable cause may be determined as a matter of law on summary judgment where there is no material dispute as to the relevant events and knowledge of the officers. *See Weyant*, 101 F.3d at 852. "[P]robable cause to arrest exists when the officers have

8

knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* When determining whether probable cause exists, courts are to "consider those facts *available to the officer* at the time of the arrest and immediately before it" and must render a decision based upon "the totality of the circumstances." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted) (emphasis in original); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

Because Ovchinnikoff has raised qualified immunity as a defense, he need not demonstrate that he had *actual* probable cause to arrest. The Second Circuit has stated:

> [I]n the context of allegations of false arrest, that an arresting officer is entitled to qualified immunity from a suit for damages on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.

*Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (citation and internal quotation marks omitted). This more lenient standard has become known as "arguable probable cause." *See id.*; *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (applying arguable probable cause in a false arrest analysis). In determining whether Ovchinnikoff had arguable probable cause to arrest Plaintiff, the Court's inquiry is confined to the facts known by Ovchinnikoff at the time of arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153-55 (2004); *Martinez v. Simonetti*, 202 F.3d 625, 635 (2d Cir. 2000); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). Since probable cause is an objective standard which excludes consideration of the subjective motivation of the arresting officers, *Southerland v. City of New York*, 681 F.3d 122 (2d Cir. 2012), Plaintiff's

9

allegation that Ovchinnikoff "bore a personal animosity towards [him]" is excluded from this analysis. Am. Compl. ¶¶ 100.

Ovchinnikoff argues that, "based on the facts and circumstances he learned and observed," he had arguable probable cause to believe that Plaintiff engaged in harassment in the second degree. Clarkstown Defs.' Mem. at 10. Ovchinnikoff points to undisputed facts that he contends establish probable cause, and in the alternative, arguable probable cause. First, it is undisputed that Giacopelli informed Ovchinnikoff and Pendergrast that Plaintiff "was really fixated on this [being] [Chatmon]'s fault," that "he said a lot of things about her . . . exact wording I can't get you . . . but . . . [I] perceived [it] to be some, you know, like he's gonna get her back somehow . . . watch where she's gonna be," and that Chatmon "drew first blood." Clarkstown Defs.' Ex. N, p. 7–8. Ovchinnikoff asked Giacopelli if he took Plaintiff's words as a "mass threat" against Chatmon and Giacopelli answered "yeah." *Id*. at 8.

Second, it is undisputed that Chatmon proactively went to the police station and told an officer—possibly Ovchinnikoff—that Plaintiff had threatened her and that she "needed to be protected before he did something." Clarkstown Defs.' Ex. O, p. 115:14-22. According to Chatmon, she told the officer that she was not leaving the police station until she received protection because she was scared. *Id*. at 116:5 – 117:12; 118:2 – 11. The record also reveals that Chatmon told Pendergrast about Plaintiff's threats and her desire for an order of protection when Pendergrast interviewed her about the incident between Plaintiff and Mlavets. Clarkstown Defs.' 56.1 ¶ 34.

Third, it is undisputed that Ovchinnikoff spoke with Vedovato, who reported that Plaintiff told him that "he was very angry at Sara Chatmon because Chatmon was the cause of all the problems he was having." Clarkstown Defs.' Ex. P. Vedovato told Ovchinnikoff that Plaintiff

had gone from "a very calm voice and demeanor to very angry and full of rage when he began to speak of Chatmon," that "the tone of [Plaintiff's] conversation concerned him and that he took it as threatening and relayed this to Chatmon," and that "if Chatmon was his sister he would be afraid and would want her to get an order of protection." *Id*.

Fourth, it is undisputed that Chatmon signed a complaint in which she described Plaintiff's alleged threats—as described to her by Giacopelli and Vedovato—and declared that Giacopelli and Vedovato "felt the comments were threatening in nature." *Id*. Giacopelli and Vedovato signed supporting depositions attesting that the information Chatmon provided in the complaint was accurate. *Id*.

Finally, Ovchinnikoff sought the advice of an ADA who advised him that she believed that there was sufficient evidence to charge Plaintiff with harassment. *Id*. The assurances of the ADA would have satisfied any doubt Ovchinnikoff may have had regarding whether he had probable cause to arrest Plaintiff.

Based on the totality of the circumstances of Plaintiff's arrest, the Court finds that arguable probable cause existed to arrest Plaintiff for harassment in the second degree. Ovchinnikoff relied on statements from three different individuals indicating that Plaintiff had made threatening statements against Chatmon, and it was objectively reasonable for him to believe that Plaintiff's statements—described by Vedovato as "angry and full of rage"—were meant to convey threats of direct and immediate violence towards Chatmon. In particular, Plaintiff's statement that Chatmon drew "first blood" reasonably suggests that Plaintiff believed that the matter was not over and that he meant to retaliate. Moreover, the record is devoid of any suggestion that either Chatmon, Giacopelli, or Vedovato were untrustworthy witnesses or

11

otherwise not credible. Accordingly, Ovchinnikoff is entitled to qualified immunity and his motion for summary judgment on Plaintiff's § 1983 claim for false arrest is GRANTED.

*ii. Malicious Prosecution Pursuant to § 1983*

A claim for malicious prosecution under § 1983 is "substantially the same" as a claim for malicious prosecution under New York law. *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015) (citing *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003)). "To establish a claim for malicious prosecution under New York law, a plaintiff must show '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor.'" *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 226 (S.D.N.Y. 2006) (quoting *Posr*, 180 F.3d at 417). In addition to these state law elements, a plaintiff must assert that there was "a sufficient post-arraignment liberty restraint to implicate plaintiff's Fourth Amendment right[]" to be free of unreasonable seizure. *Id.* (quoting *Rohman v. N.Y.C. Transit Authority*, 215 F.3d 208, 215 (2d Cir. 2000)) (internal quotation marks omitted). Probable cause is a complete defense for claims of malicious prosecution, similar to claims of false arrest. *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010) (quoting *Savino*, 331 F.3d at 72).

Ovchinnikoff does not dispute that he initiated a prosecution against Plaintiff, that the prosecution was terminated in Plaintiff's favor, and that Plaintiff was subjected to post-arraignment restraints. Therefore, the only issues in dispute are whether Ovchinnikoff lacked probable cause to believe the proceeding could succeed and whether he acted with malice. Plaintiff contends that "at the time when Defendants initiated and continued the prosecution against [Plaintiff], they knew there was no probable cause to believe that [Plaintiff] had

committed a violation of harassment or any other crime or violation." Am. Compl. ¶ 98. Plaintiff also contends that Ovchinnikoff acted with malice because he "failed to make a full and complete statement of facts to the prosecutor and otherwise mislead members of the prosecutor's office . . . ." Am. Compl. ¶ 102.

As discussed, Ovchinnikoff had at least arguable probable cause to arrest Plaintiff. "Even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir.1996). Here, there are no facts in the record indicating that probable cause dissipated between Plaintiff's arrest and the initiation of the prosecution. "The existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). Because the Court finds that Ovchinnikoff had at least arguable probable cause to arrest Plaintiff, and there is no indication that arguable probable cause dissipated in any manner between Plaintiff's arrest and the initiation of the prosecution, Plaintiff's malicious prosecution claim against Ovchinnikoff fails. *See Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) ("Plaintiff's . . . malicious prosecution [claim] therefore turn[s] on whether the defendant officers' probable cause determination was objectively reasonable—that is, whether there was arguable probable cause to arrest."). Because Plaintiff's claim fails on the probable cause prong of the inquiry, the Court need not determine whether Ovchinnikoff acted with malice. Accordingly, Ovchinnikoff's motion for summary judgment on Plaintiff's § 1983 claim for malicious prosecution is GRANTED.

### B. Plaintiff's Claims Against Sullivan, Noonan, and Mahon

Plaintiff claims that Sullivan, Noonan, and Mahon are liable for false arrest and malicious prosecution pursuant to § 1983 because they (1) were Ovchinnikoff's supervisors, (2) were "in a

position to intervene and prevent [Plaintiff's] unlawful arrest and prosecution," and (3) failed to do so. Am. Compl. ¶¶ 86–94. Therefore, Plaintiff's claims against Sullivan, Noonan, and Mahon are based on a theory of supervisory liability. "[F]or a supervisor to be liable under § 1983, there must have been an underlying constitutional deprivation." *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir.1999); *see also Elek v. Incorporated Village of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) ("Because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisory liability."). Here, Plaintiff has failed to establish that Ovchinnikoff is liable for false arrest or malicious prosecution because he had at least arguable probable cause. As a result, Plaintiff's claims against Sullivan, Noonan, and Mahon on the ground that they were Ovchinnikoff's supervisors also fail. Accordingly, Sullivan, Noonan, and Mahon's motion for summary judgment on Plaintiff's false arrest and malicious prosecution claims is GRANTED.

### C. Plaintiff's State Law Claims Against the Officers

In addition to his § 1983 claims, Plaintiff brings state law claims for false arrest and malicious prosecution against the officers. "The elements of false arrest and malicious prosecution under § 1983 are substantially the same as the elements under New York law. Therefore, the analysis of the state and the federal claims is identical." *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). Because the Court has already found that at least arguable probable cause to arrest and initiate a prosecution against Plaintiff existed, Plaintiff's state law false arrest and malicious prosecution claims are also without merit. Accordingly, the officers'

motion for summary judgment on Plaintiff's state law false arrest and malicious prosecution claims is GRANTED.

### D. **Plaintiff's *Monell* Claim Against the Town of Clarkstown**

A municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior*. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 (1978). A § 1983 claim can only be brought against a municipality if the action that is alleged to be unconstitutional was the result of an official policy or custom. *Id.* at 690–91. Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury. *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 403 (1997); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell*, 436 U.S. at 692).

A *Monell* claim cannot lie absent an underlying constitutional violation. *Bolden v. County of Sullivan*, 523 Fed. Appx. 832, 834 (2d Cir. 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct.") (citing *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original)). Since Plaintiff has not established a constitutional violation, his *Monell* claim also fails.

15

### E. Plaintiff's Claims Against Chatmon and Giacopelli

Plaintiff claims that Chatmon and Giacopelli—who are private individuals—are liable pursuant to § 1983 because they "conspired . . . to violate [Plaintiff's] civil rights and have him falsely arrested, maliciously prosecuted and deprived of his right to due process by jointly pursuing a criminal charge against [Plaintiff] which was not warranted by law and which in any event was based upon fabricated and contrived evidence." Am. Compl. ¶ 78, 96, 105. It is well-settled law that "private individuals who are not state actors may be liable under § 1983 if they have conspired with or engaged in joint activity with state actors." *Caporicci v. Nassau County Police Department*, No. 05 Civ. 5764, 2007 WL 764535 at *8 (E.D.N.Y. 2007) (citing cases). "Where, as here, however, all substantive § 1983 claims against named state actors have been dismissed, claims alleging participation in a civil rights conspiracy must also be dismissed." *Maloney v. County of Nassau*, No. 03 Civ. 4178, 2010 WL 3940456, at *9–10 (E.D.N.Y. Sept. 30, 2010) (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir.1995)). This is because a § 1983 conspiracy action "will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right." *Singer*, 63 F.3d at 119. Because the Court has dismissed all of Plaintiff's § 1983 claims against named state actors, Plaintiff's § 1983 claims against Chatmon and Giacopelli must also be dismissed. Accordingly, Chatmon and Giacopelli's motion for summary judgment on Plaintiff's federal false arrest and malicious prosecution claims is GRANTED.

Plaintiff also brings state law claims of false arrest and malicious prosecution against Chatmon and Giacopelli. Am. Compl. ¶¶ 111–112. Under New York law, "a civilian defendant who merely furnishes information to law enforcement authorities who are then free to exercise their own independent judgment as to whether an arrest will be made and criminal charges filed

will not be held liable for malicious prosecution or false arrest." *Robles v. City of New York*, 104 A.D.3d 829, 829–30 (2013) (internal quotation marks and citation omitted). A plaintiff must demonstrate that the civilian defendant "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Du Chateau v. Metro–North Commuter Railroad Company*, 253 A.D.2d 128, 131 (1999) (internal quotation marks and citation omitted). "The defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition." *Oszustowicz v. Admiral Insurance Brokerage Corporation*, 49 A.D.3d 515, 516 (2008) (internal quotation marks and citations omitted); *see also Wasilewicz v. Village of Monroe Police Department*, 3 A.D.3d 561, 562 (2004) ("[Civilian defendants] cannot be liable for false arrest, false imprisonment, and malicious prosecution unless they affirmatively induced a police officer to act.").

There is no indication in the record that Chatmon or Giacopelli induced any law enforcement officers to either arrest or prosecute Plaintiff to the point where they were not acting of their own volition. Instead, the record indicates that Chatmon and Giacopelli did no more than furnish information to law enforcement authorities regarding what they perceived to be threatening language by Plaintiff towards Chatmon. Plaintiff's allegations that Chatmon and Giacopelli actively conspired with Ovchinnikoff and fabricated evidence to get Plaintiff arrested and prosecuted are wholly without support in the record. Accordingly, Chatmon and Giacopelli's motion for summary judgment on Plaintiff's state law claims of false arrest and malicious prosecution is GRANTED.

## V. Conclusion

For the reasons set forth above, Defendants' motions for summary judgment are GRANTED in their entirety. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 84, 102, and 108.

It is SO ORDERED.

Dated: September 15, 2017
New York, New York

Edgardo Ramos, U.S.D.J.
United States District Judge