UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RODNEY PICOTT and DOUGLAS HARLE,

                          Plaintiffs,

            - against -

SARA CHATMON, CHRIS GIACOPELLI, CAPTAIN
ANTHONY OVCHINNIKOFF, Individually, CHIEF
MICHAEL SULLIVAN, Individually and in his official
capacity, FORMER CHIEF PETER NOONAN,
Individually and in his official capacity, ROBERT
MAHON, Individually and in his official capacity, and the
TOWN OF CLARKSTOWN,

                          Defendants.

**OPINION AND ORDER**

12 Civ. 7202 (ER)

Ramos, D.J.

          Douglas Harle[1] brings this action against Captain Anthony Ovchinnikoff, in his individual

capacity, Chief Michael Sullivan, Former Chief Peter Noonan, and Robert Mahon, in their official

and individual capacities, and the Town of Clarkstown (together, "Defendants"). All of the

individual defendants are current and former members of the Town of Clarkstown Police

Department. Plaintiff alleges that Defendants violated his First and Fourth Amendment rights

pursuant to 42 U.S.C. § 1983. Plaintiff also brings a *Monell* claim against the Town of

Clarkstown, as well as state law claims for breach of contract and violations of New York Labor

Law § 191. Pending before the Court is Defendants' motion for summary judgment on all of

Plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. Doc. 88.

---

[1] This matter was originally filed by both Harle and Rodney Picott. By Opinion and Order dated September 25, 2013, the Court severed Harle's claims from those of Picott. Doc. 32.

For the reasons discussed below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I. Factual Background

Plaintiff was a police officer with the Town of Clarkstown Police Department from 1998 until he retired with a line of duty injury in 2011. Defs.' 56.1 ¶ 1, 8–9. During the relevant time period, Defendants were members of the Clarkstown Police Department: Anthony Ovchinnikoff was a lieutenant and became Administrative Captain in February 2011, Peter Noonan was the Chief of Police from 2004 through February 2011, Robert Mahon was the Operations Captain, and Michael Sullivan was the Administrative Captain from April 2009 until February 2011, when he became the Chief of Police. Pl.'s 56.1 ¶¶114–117.

While Plaintiff was on duty on August 27, 2008, he responded to a call from a business owner at Palisades Mall regarding possible payroll check theft. Defs.' 56.1 ¶ 10; Pl.'s 56.1 ¶ 119. The business owner reported that he had not received a Federal Express package containing the checks, but that Federal Express had confirmed that the package was signed for by someone at a kiosk at the mall. Pl.'s 56.1 ¶ 120. Plaintiff interviewed the owner of the kiosk, who was of Middle Eastern descent, about the missing checks. According to Plaintiff, the kiosk owner was "acting in a strange and evasive manner" and denied any knowledge of the checks. Plaintiff then learned that the kiosk owner's son had signed for the checks and was on a terror watch list. *Id.* ¶¶ 121, 125–126.

Plaintiff observed the kiosk owner make a sale without having the required sales tax license on display. *Id.* ¶¶ 121, 128. Plaintiff then learned that the kiosk owner did not have a certain permit that is required to operate a business in New York. *Id.* ¶ 129. Suspecting that the kiosk owner was engaging in sales tax fraud, Plaintiff contacted state tax authorities and

Investigator Rodney Livolsi ("Livolsi") of the New York State Police. *Id*. ¶ 130–131. According to Plaintiff, Livolsi requested that Plaintiff arrest the kiosk owner. Defs.' 56.1 ¶ 17. While Plaintiff was speaking with Livolsi, Ovchinnikoff, who was Plaintiff's superior, arrived at the scene and directed Plaintiff to continue investigating and to not arrest the kiosk owner concerning the sales tax issue. *Id*. ¶ 13. Ovchinnikoff indicated that this was something for the state tax department to handle and that Plaintiff should forward his observations to them. Defs.' 56.1 ¶ 14.

Plaintiff wrote a police report summarizing the incident. *Id*. ¶ 17. In that report, Plaintiff stated that Livolsi requested that he arrest the kiosk owner for not having a valid tax license, but that Ovchinnikoff told him not to arrest the suspect and instead "gather the information and forward it as required." *Id*. The report states that the New York State Taxation and Finance Authority "would be investigating . . . and would contact us at a future date to assist them in this investigation" and that "they would be trying to seize as many of [suspect's] assets as possible during their investigation." *Id*. ¶ 20. Plaintiff also wrote that Livolsi had stated that he "wanted to try to place [the suspect] on [a terror watch list]." Defs.' Ex. F.

On August 28, 2008, Plaintiff emailed Livolsi from his personal email account regarding the suspected sales tax fraud. Defs.' Ex. F. As an attachment to the email, he sent Livolsi the summary of the incident he had included in his police report. *Id*.; Defs.' 56.1 ¶ 18. Livolsi responded by telling Plaintiff that he would work on getting a lead into the matter and attached a form for Plaintiff to fill out and have signed "by the [Captain] or whoever." Defs.' Ex. F

On August 29, 2008, Livolsi wrote Plaintiff again and said that he "got the case in IDS and sent out a lead" and that someone may contact Plaintiff regarding the case. *Id*. Addressing the content of Plaintiff's police report, Livolsi told Plaintiff that he had *not* said that he wanted to

put the suspect on a terror watch list during their initial call about the case. *Id*. ("Not that it is a big deal but I didn't say I wanted to get him on the Watch list – it was the IDS system I was talking about. We don't have anything to do with the Watch list here at the NYSIC – that is a Federally controlled list. He is now in the IDS system so if he is run through here again, your case will pop up."). Livolsi also stated that "to avoid any issues with [Plaintiff's] chain of command," he had only told Plaintiff that "if the [kiosk owner] did violate any laws whether they [be] business or tax laws, he could be arrested and should be." *Id*. Livolsi wrote that "it would be wrong for me to request that you arrest [the suspect] – I would be stepping on toes and making a decision without proper authority." *Id.* Livolsi filed an incident report on August 29, 2008, noting that the Clarkstown Police Department was continuing to investigate. Defs.' Ex. G.

Plaintiff emailed Livolsi again on August 30, 2008. Defs.' Ex. F. He wrote that (1) he received a "tax charge" from someone at the tax department and he would be preparing it over the weekend, (2) the suspect would "receive a criminal summons from our Justice Department to appear in court" and would be fingerprinted and photographed, and he would let Livolsi know when this was done so that Livolsi could add the information to his files, (3) he was trying to identify other individuals working at related kiosks so they could also be charged, (4) he was waiting to speak with the New York State Tax Enforcement Division "to see how they want to approach the issue," (5) he had been watching the kiosks collect sales tax and that every time they failed to remit tax to the county and state they were "committing petit larceny," (6) he had "reached out to some of the counterfeit property investigators from the major retailers . . . to see if they want to get in on this" and that if they did, he would "seize everything [the suspect] has and charge him with trademark counterfeiting" and "put him out of business rather quickly," (7) he would edit his police report to "correct the watch list error." *Id*.

Plaintiff explained to Livolsi that he made the watch list error because he had been "angry typing after [Ovchinnikoff] refused to let us collar" the suspect. *Id.* He also wrote that Ovchinnikoff was "afraid to do anything he doesn't know how to do or has no experience in" and that this happened "rather frequently" and was "a bit frustrating." *Id.*

In August or September 2008, Mahon attended an anti-terrorism meeting with area officials and was made aware of the emails between Plaintiff and Livolsi. Defs.' 56.1 ¶ 34. Mahon was given a copy of the emails and he provided them to Ovchinnikoff. *Id.* ¶ 35; Pl.'s 56.1 ¶ 149. On September 12, 2008, Plaintiff was charged with disciplinary charges for (1) conduct bringing discredit upon the police department, (2) insubordination or disrespect towards a superior officer, and (3) speaking disrespectfully about, or publicly criticizing or ridiculing official action or a member of the department. Defs.' 56.1 ¶ 42. Plaintiff pleaded guilty to speaking disrespectfully about a member of the department and entered into a stipulation settlement for the disciplinary charges, in which Plaintiff released all claims predating the stipulation. *Id.* ¶ 43; Pl.'s 56.1 ¶ 154.

Plaintiff claims that Defendants retaliated against him because of his August 30, 2008 email to Livolsi criticizing Ovchinnikoff. Pl.'s 56.1 ¶ 151. He alleges that he was immediately reassigned to desk duty as punishment, *Id.* ¶ 153, and was "frozen out at the police department and whenever he walked into the police department, [his] coworkers would not talk to him and would not even acknowledge [his] presence." *Id.* ¶ 157. Plaintiff was injured while on duty on November 5, 2008, and was out of work until he received a disability retirement in November 2011. *Id.* ¶ 158. He alleges that the retaliation continued while he was out of work. During that time, he was required to report to Ovchinnikoff every two weeks. *Id.* ¶ 161. According to Plaintiff, his coworkers continued to shun and ignore him whenever he reported to Ovchinnikoff.

*Id.* ¶ 162. Plaintiff claims that he was referred to as a "rat" on a number of occasions. *Id.* ¶ 163–166. For example, his name was scratched out on his locker and the word "rat" was written next to it. *Id.* ¶ 163. His name was crossed out from a bulletin board that everyone in the department could see and was replaced with the words "rat" or "disgrace." *Id.* ¶ 179–180. Another member of the Clarkstown Police Department, Officer Nieves, testified that he heard other officers referring to Plaintiff as a "rat" in the workplace and saw the word "rat" written next to Plaintiff's name on various lists. Pl.'s Ex. 6, 7–9. In addition to being labelled a "rat," Plaintiff claims that he was subjected to other forms of harassment by fellow officers because of his email exchange with Livolsi, such as having his boots and uniform routinely stolen. *Id.* ¶¶ 176–177. Plaintiff claims that he complained about the harassment to his supervisors, including Defendants, and they ignored him. Am. Compl. ¶ 128.

Plaintiff claims that—in addition to allowing officers to harass Plaintiff and ignoring Plaintiff's complaints—Defendants retaliated against him in two other ways. First, Plaintiff claims that in May 2010, Noonan and Sullivan spread rumors that Plaintiff—who had been taking prescription pain medication since his November 2008 injury—was a drug addict and was abusing prescription medication. Am. Compl. ¶ 133. Plaintiff claims that Noonan, Sullivan, and Ovchinnikoff attempted to coerce Plaintiff to attend a drug rehabilitation facility under the threat of being terminated. *Id.* ¶ 138. According to Plaintiff, Defendants ordered Plaintiff to submit to two blood and urine tests—both in May 2010—in furtherance of their "plot" to have Plaintiff terminated for a drug addiction he did not actually have. *Id.* ¶ 139. Plaintiff claims that the blood and urine tests were illegal searches and seizures that violated his Fourth Amendment rights. *Id.* ¶ 143.

Second, Plaintiff claims that Defendants refused to pay him for unused vacation and holiday time he accrued during the time he was out of work. Am. Compl. ¶ 153. In 2010, Plaintiff asked Ovchinnikoff why he was not paid for accrued holiday and vacation time and Ovchinnikoff stated that he was not entitled to them under the new collective bargaining agreement between Plaintiff's union and the Town of Clarkstown. Pl.'s 56.1 ¶ 253. At some point thereafter, Plaintiff complained to his union representative about not receiving the benefits and the representative "walked away." *Id*. ¶ 255. Plaintiff then spoke with the head of the union grievance committee, who told Plaintiff that he was entitled to the benefits but that the union "was not going to fight for it." *Id*. ¶ 256.

At some point in either 2011 or 2012, Plaintiff made a complaint to the U.S. Department of Justice ("DOJ") concerning his belief that a fellow Clarkstown police officer, Rodney Picott, had been falsely arrested. Pl.'s Ex. 1, pp. 334–337. According to Plaintiff, after he made the complaint to the DOJ, the union president told him that if he continued to help Picott, the administration would order him to go back to work and would do everything in its power to make sure he did not get a disability pension. Pl.'s 56.1 ¶ 248. Officer Nieves testified that he heard Mahon "bragging about [Plaintiff] having attempted to make a complaint to the FBI regarding some of the stuff that was occurring at the police department" and that Mahon was "poking fun at the notion of [Plaintiff] having attempted to make a complaint." Pl.'s Ex. 4, pp. 73–74. Plaintiff claims that his DOJ complaint was a motivating factor—in addition to his email exchange with Livolsi—in Defendants' retaliatory failure to act when Plaintiff was called a "rat" and their refusal to pay him his accrued vacation and holiday time. Pl.'s 56.1 ¶ 247.

## II.     Procedural Background

Harle brought this action together with Picott on September 24, 2012.  Doc. 1.  Harle alleged violations of his First and Fourth Amendment rights pursuant to § 1983—based on Defendants' alleged retaliation for his email to Livolsi and DOJ complaint, and the blood and urine tests, respectively—as well as state law claims for breach of contract and violations of New York Labor Law § 191 based upon Defendants' failure to pay him his accumulated vacation and holiday time.  *Id.*  Picott alleged violations of his Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, as well as state law claims for false arrest and malicious prosecution, based on unrelated incidents.  *Id.*  Both Harle and Picott also alleged a *Monell* claim against the Town of Clarkstown, which they alleged had a custom and policy of "allowing and permitting constitutional violations of targeted police officers by other officers and supervisors at the Clarkstown police department."  Doc. 1.  Harle and Picott filed an Amended Complaint on November 9, 2012.  Doc. 4.

Defendants filed a motion to sever on February 21, 2013.  Doc. 17.  The Court found that Picott's and Harle's claims should have been brought as separate actions and granted the motion. Doc. 32.  Defendants brought the instant motion for summary judgment on September 16, 2016. Doc. 88.

## III.     Legal Standard on Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the

outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)) (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

## IV.    Discussion

### A.  First Amendment Retaliation Claim Pursuant to § 1983

Plaintiff claims that Defendants retaliated against him for (1) his August 30, 2008 email to Livolsi, and (2) his complaint to the DOJ concerning Picott's arrest.  Whether Defendants are entitled to summary judgment with respect to each statement is analyzed in turn.

#### i.    August 30, 2008 Email to Livolsi

In order to prevail on a First Amendment retaliation claim, a public employee must prove that:  (1) his speech was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.  *See Anemone v. Metropolitan Transportation Authority*, 629 F.3d 97, 114 (2d Cir. 2011) (internal quotation marks and citation omitted).  To determine whether a public employee's speech is protected by the First Amendment, courts employ a two-step approach.  First, the court must determine "whether the employee spoke as a citizen on a matter of public concern."  *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).  If the answer to this question is no, then "the employee has no First Amendment cause of action based on . . . [his] employer's reaction to the speech."  *Garcetti*, 547 U.S. at 418.  If the answer is yes, the court must then decide "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Garcetti*, 547 U.S. at 418.

This first factor, "whether the employee spoke as a citizen on a matter of public concern," consists of two subcomponents: "(1) whether the subject of the employee's speech was a matter

of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Matthews*, 779 F.3d at 172 (internal citation omitted). Whether a plaintiff spoke on a matter of public concern is "a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Ruotolo v. City of New York*, 514 F.3d at 189 (internal quotation marks and citation omitted). Speech will fairly be characterized as a matter of public concern if it "relate[s] to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose." *Ruotolo*, 514 F.3d at 189 (internal quotation marks and citations omitted). Thus, a public employee's speech on matters of purely personal interest or internal office affairs does not constitute a matter of public concern. *See Connick*, 461 U.S. at 148–49 ("To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case.").

Whether a plaintiff spoke as an employee and not as a citizen is "largely a question of law for the court." *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011). The Supreme Court has ruled that a public employee acting pursuant to his official duties does not speak as a citizen for First Amendment purposes. *Garcetti*, 547 U.S. at 1960 ("[Plaintiff] did not act as a citizen when he went about conducting his daily professional activities . . . . When he went to work and performed the tasks he was paid to perform, [plaintiff] acted as a government employee."). Whether a public employee spoke pursuant to his official duties is an objective and "practical" inquiry. *Weintraub v. Board of Education*, 593 F.3d 196, 202 (2d Cir.2010) (internal citation omitted). The Second Circuit has held that "under the First Amendment, speech can be 'pursuant

to' a public employee's official job duties even though it is not required by, or included in, the employee's job description or in response to a request by the employer." *Id.* at 203.

Defendants contend that Plaintiff's email to Livolsi did not address a matter of public concern because "the facts show that this was an internal matter involving an officer's controversy with his superior." Defs.' Mem. at 18. Plaintiff, on the other hand, contends that his email was protected speech because he "expressed his personal opinions concerning the impropriety of a superior officer's incompetence in thwarting his efforts to protect the public from criminal and possibly terrorist activity, which was unquestionably a matter of public concern." Pl.'s Opp'n at 5. Defendants also argue that Plaintiff wrote the email to Livolsi "not as a citizen but as part of his responsibilities as a police officer, following up on an investigation as directed by Lt. Ovchinnikoff." Defs.' Reply at 5. Plaintiff, however, contends that he spoke as a citizen because he sent the email from his personal email account. Pl.'s Opp'n at 5.

The Court finds that Plaintiff's description of his email to Livolsi—as an "expression of his personal opinions concerning the impropriety of a superior officer's incompetence in thwarting his efforts to protect the public"—mischaracterizes the nature of the email. The content, form, and context of the email reveals that the thrust of Plaintiff's email was to voice his personal frustration with Captain Ovchinnikoff's instruction to not arrest a potential suspect. Plaintiff did not voice a concern about official misconduct or incompetence, nor did he mention that he believed that Captain Ovchinnikoff's decision placed the public at risk. Instead, he wrote that he had been "angry typing" and that he was frustrated with what he perceived to be Captain Ovchinnikoff's fear "to do anything he doesn't know how to do or has no experience in." Defs.' Ex. F.

"Courts must look behind pretextual 'public concern' rationales proffered by plaintiffs and attempt to discern whether their conduct, taken as a whole, was actually meant to address matters of public concern or was simply a vehicle for furthering private interests." *Local 621, S.E.I.U., AFL-CIO v. City of New York*, No. 99 Civ. 9025, 2002 WL 31151355, at *15 (S.D.N.Y. Sept. 26, 2002). Notwithstanding Plaintiff's after-the-fact claim that the purpose of his email was to voice a public concern, it is evident that the overriding concern of Plaintiff's email was to air his personal dissatisfaction and frustration with a superior. *See Hellstrom v. U.S. Department of Veterans Affairs*, 46 F. Appx. 651, 656 (2d Cir. 2002) ("[Plaintiff] was angry at [Defendant] because he refused to discipline another employee . . . and his outbursts regarding [Defendant] and his shortcomings as a director were directly related to this fact. As such, [Plaintiff]'s complaints about [Defendant] were motivated by personal interests and anger and not some altruistic desire to improve the [agency] or protect the public."). Accordingly, the Court concludes as a matter of law that Plaintiff did not speak on a matter of public concern.

Although it is a closer question, the Court also finds that Plaintiff spoke pursuant to his official duties and not as a citizen when he emailed Livolsi. Plaintiff contends that he spoke as a "civilian" and not in his official capacity because he emailed Livolsi from a personal email account. Pl.'s Opp'n at 5. This fact, however, is not dispositive. "Courts consider several factors when attempting to determine if a public employee spoke pursuant to his official duties, including: (1) the plaintiff's job description; (2) the persons to whom the speech was directed; (3) whether the speech resulted from special knowledge gained through the plaintiff's employment; (4) whether the speech occurs in the workplace; and (5) whether the speech concerns the subject matter of the employee's job." *Airday v. City of New York*, 131 F. Supp. 3d 174, 179–80 (S.D.N.Y. 2015) (internal citation omitted).

Applying these factors, the Court concludes that Plaintiff emailed Livolsi as a police officer, and not as a citizen. First, Plaintiff's email exchange with Livolsi was directly connected to the subject matter of his job as a police officer. For example, over the course of their email exchange, Plaintiff sent Livolsi a version of the police report he wrote summarizing the August 27, 2008 incident and told Livolsi that he would add information to the report. Defs.' Ex. F. He also told Livolsi that he would prepare the "tax charge" he received from the New York State Taxation and Finance Authority and that he would potentially "seize everything [the suspect] has and charge him with trademark counterfeiting." *Id*. In one email, Livolsi told Plaintiff to fill out a form and have it "signed by the [Captain] or whoever." *Id*. Thus, the content of the emails indicates that Plaintiff and Livolsi were discussing potential law enforcement activity, a topic that directly concerns Plaintiff's job as a police officer. Second, a significant portion of the email exchange discussed steps Plaintiff would take as a police officer in the tax fraud investigation and coordination with other law enforcement agencies (i.e., editing his police report, seizing property from the suspect, pursuing criminal charges, waiting to see how the tax authorities wanted to approach the case). Investigating suspected criminal activity and coordinating with other law enforcement agencies fall squarely within Plaintiff's official duties as a police officer. Finally, Plaintiff's emails to Livolsi directly resulted from knowledge Plaintiff gained while on duty and responding to a report of a possible crime. Moreover, the email exchange can reasonably be interpreted as Plaintiff following up on Ovchinnikoff's instruction to continue investigating and forward information to the relevant authorities. Considering the relevant factors, the Court finds that Plaintiff spoke pursuant to his official duties and not as a citizen. Because the Court determines that Plaintiff did not speak as a citizen

on an issue of public concern when he emailed Livolsi, this portion of Plaintiff's First Amendment claim cannot survive summary judgment.

### ii. DOJ Complaint

Plaintiff claims that Defendants retaliated against him for complaining to the DOJ regarding Picott's arrest. Pl.'s 56.1 ¶ 247. Defendants do not address whether Plaintiff spoke as a citizen on a matter of public concern when he made the complaint to the DOJ. Instead, they argue that Plaintiff fails to provide any evidence of a causal connection between his speech and the retaliation he alleges. Defs.' Reply at 6 ("There are no facts supporting a finding of the existence of a causal connection between the speech and the word 'rat' that was written next to Harle's name. Additionally, it is unclear on the facts as to when Plaintiff alleges to have made a complaint to the Department of Justice with regard to the arrest of Rodney Picott. There is no evidence as to when this occurred and there are no records proffered by Plaintiff regarding said complaint.").

To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate a "'causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" *Kelly v. Huntington Union Free School District*, 675 F. Supp. 2d 283, 296-97 (E.D.N.Y. 2009) (quoting *Cotarelo v. Sleepy Hollow Police Department*, 460 F.3d 247, 251 (2d Cir. 2006)). A plaintiff can demonstrate a causal connection "indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (internal quotation marks and citation omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an

allegedly retaliatory action," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001), and "courts must carefully consider the time lapse in light of the entire record." *Kelly*, 675 F. Supp. 2d at 297 (citing cases). If the plaintiff can satisfy this burden, the defendant must "demonstrate by a preponderance of the evidence that it would have undertaken the same adverse employment action even in the absence of the protected conduct." *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994) (internal quotation marks and citation omitted).

The Court finds that Plaintiff's First Amendment claim based on his DOJ complaint cannot survive summary judgment because he has failed to establish a causal connection between his speech and the alleged retaliation. To start, Plaintiff has offered little evidence that any of the Defendants had knowledge of Plaintiff's complaint to the DOJ. *See Deal v. Seneca County*, No. 07 Civ. 6497 (MAT), 2012 WL 13661, at *6 (W.D.N.Y. Jan. 4, 2012) ("To prove a causal connection, the plaintiff must demonstrate that the individuals who engaged in retaliation had knowledge of the protected conduct."). Plaintiff attempts to establish that Defendant Mahon had knowledge of the DOJ complaint by relying on Officer Nieves' deposition testimony that at an unidentified point in time, Defendant Mahon "was bragging about Harle having attempted to make a complaint to the FBI regarding some of the stuff that was occurring at the police department." Pl.'s Ex. 4, pp. 73–74. However, Plaintiff testified in his deposition that he complained to the DOJ and never spoke to the FBI about the matter. Pl.'s Ex. 1, p. 334–335. Plaintiff's reliance on Officer Nieves' deposition to establish that Defendant Mahon was aware of the DOJ complaint is misplaced: Officer Nieves never testified that he heard Defendant Mahon discuss Plaintiff's complaint to the DOJ. In his Amended Complaint, Plaintiff stated that

his DOJ complaint was forwarded to the FBI and that a member of the FBI told a Clarkstown detective about it. However, Plaintiff has not offered any evidence to support this allegation.

More importantly, Plaintiff has failed to demonstrate that any of the retaliation he claims to have suffered occurred after he made the complaint to the DOJ. According to Plaintiff, he made the complaint "probably" in 2011 or "maybe" in 2012. Pl.'s Ex. 1, pp. 334–335. He claims that after he made the complaint, Defendants retaliated against him "by denying him his accrued benefits and [doing] nothing when the word rat was written next to his name and hung next to his name in places that were prominent in the police department." Pl.'s 56.1 ¶ 247. However, Plaintiff has not provided any specific evidence that postings of the word "rat"— which the record indicates began after Plaintiff emailed Livolsi—continued after the DOJ complaint. Indeed, Plaintiff fails to even provide approximate dates of either the DOJ complaint or the alleged "rat" postings. Moreover, even if Plaintiff had evidence demonstrating that the "rat" postings continued after the DOJ complaint, he fails to provide any evidence that they were made, at least in part, as a result of the DOJ complaint and not solely in continued response to Plaintiff's August 2008 email to Livolsi. Therefore, the Court finds that Plaintiff's assertion that the "rat" label and related harassment intensified after the DOJ complaint is conclusory and wholly unsupported by the record.

Plaintiff also fails to establish a nexus between his DOJ complaint and Defendants' alleged denial of accrued benefits. The record actually indicates that Plaintiff's dispute with Defendants regarding payment of holiday and vacation days occurred in 2010, *before* Plaintiff complained to the DOJ in either 2011 or 2012. Pl.'s 56.1 ¶ 253 ("For 2008, 2009 and 2010, Plaintiff requested that all of his available holiday and vacation pay be cashed out and submitted [his] requests to the Administrative Captain. In 2010, Plaintiff asked Captain Ovchinnikoff why

he was not paid for his holiday and vacation days and [Ovchinnikoff] stated that he was no longer entitled to them . . . ."); *Id*. ¶¶ 255–256 ("[After Ovchinnikoff stated that he was no longer entitled to them], the Plaintiff complained to his union representative Brian Michelle . . . . After the Plaintiff spoke with Brian Michelle, he also spoke with Sgt. Joseph Reiter, who . . . advised him that [he] was not being paid the vacation and holiday pay."). Furthermore, the record is devoid of any facts indicating that Defendants made additional decisions regarding payment of holiday and vacation days after 2010 or shortly thereafter. Plaintiff's conclusory claim that Defendants retaliated against him because he made a complaint to the DOJ falls short of creating a genuine issue of material fact and cannot survive summary judgment.

Accordingly, Defendants' motion for summary judgment on Plaintiff's First Amendment claim is GRANTED.

### B. Fourth Amendment Claim Pursuant to § 1983

Plaintiff contends that on two occasions, Defendants ordered him to submit to blood and urine tests without probable cause that he had committed a crime, and that such tests constituted illegal searches and seizures in violation of the Fourth Amendment. Am. Compl. ¶¶ 139, 143. The Fourth Amendment, applicable to the states through the Fourteenth Amendment, *see Elkins v. United States*, 364 U.S. 206, 213 (1960), states that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Fourth Amendment's protection against unreasonable searches and seizures applies to drug testing of public employees by government employers. *See Skinner v. Railway Labor Executives Assoc.*, 489 U.S. 602 (1989); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989); *Watson v. Sexton*, 755 F. Supp. 583, 588–89 (S.D.N.Y. 1991). Thus, Defendants' drug

testing of Plaintiff must satisfy the Fourth Amendment's "reasonableness" requirement. *See Maryland v. King*, 133 S.Ct. 1958, 1969 (2013) (collecting cases holding that the "ultimate measure of the constitutionality of a governmental search is reasonableness") (internal quotation marks and citation omitted).

"Courts judge the reasonableness of a search by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Cassidy v. Chertoff*, 471 F.3d 67, 74 (2d Cir. 2006) (internal quotation marks and citation omitted). "[R]easonableness generally requires the obtaining of a judicial warrant supported by probable cause." *Lynch v. City of New York*, 737 F.3d 150, 157 (2d Cir. 2013) (citing *Vernonia School District 47J v. Acton*, 515 U.S. 646, 653 (1995)). "In a limited set of circumstances, however, the Supreme Court has held that a search warrant, and the requisite showing of probable cause, are not required." *Cassidy v. Chertoff*, 471 F.3d 67, 74 (2d Cir. 2006). A warrantless search without probable cause may be constitutional "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation marks omitted); *see National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665–66 (1989) ("[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.")

Here, Defendants move for summary judgment on Plaintiff's Fourth Amendment claim on the ground that they are entitled to qualified immunity because "it was reasonable for Defendants to request [Plaintiff] to submit to a blood test." Defs.' Mem. at 11. Whether

Defendants' request was reasonable or unreasonable is not the issue here. The correct question in this case is whether any "special need" justified drug testing without probable cause. Defendants fail to even attempt to argue the existence of a "special need,"[2] and their only mention of the term "probable cause" is cursory, conclusory, and inconsequential. *See Id.* at 12 ("There is no evidence to support [Plaintiff's] claim that Defendant Michael Sullivan without probable cause . . . ordered [Plaintiff] submit to blood and urine tests without probable cause to believe that he had committed any crime . . . ."). Because Defendants have failed to address whether they had probable cause to submit Plaintiff to a drug test, and have failed to argue that probable cause was not required, the Court is unable to determine whether they are entitled to summary judgment. Accordingly, Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claim is DENIED.

## C. *Monell* Claim

A municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior*. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 (1978). A § 1983 claim can only be brought against a municipality if the action that is alleged to be unconstitutional was the result of an official policy or custom. *Id.* at 690–91. Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury. *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 403 (1997); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("A municipality or other local government may be

---

[2] To be sure, it is well established that the government need not have a warrant or probable cause to drug test public employees in "safety-sensitive" jobs, such as officers who carry firearms, due to the "important government interest in assuring that [such employees] are free from the effects of drug use during or affecting performance of their work and because of lower expectations of privacy for employees performing such work." *Verri v. Nanna*, 972 F. Supp. 773, 790 (S.D.N.Y. 1997). Although Plaintiff was employed as a police officer, it is undisputed that he had been on disability leave from 2008 until his retirement in 2011. Therefore, the Court does not consider Plaintiff to have been in a "safety-sensitive" position at the time he was drug tested.

liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell*, 436 U.S. at 692).

Plaintiff alleges that the Clarkstown Police Department "had a policy and custom of retaliating against and violating the constitutional rights of officers who spoke out against the administration or other officers" and that "there was a longstanding practice and custom at the Clarkstown Police in which officers who disclosed misconduct were deemed to be 'rats' and retaliated against through civil rights violations." Pl.'s Opp'n. at 23. In other words, Plaintiff claims that the Town of Clarkstown is liable under *Monell* for violating the First Amendment rights of police officers.

A *Monell* claim cannot lie absent an underlying constitutional violation. *Bolden v. County of Sullivan*, 523 Fed. Appx. 832, 834 (2d Cir. 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct.") (citing *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original)). Since Plaintiff has not established a violation of his First Amendment right to free speech, his *Monell* claim also fails.

**D.  State Law Claims**

Plaintiff's state law claims are based on Defendants' alleged refusal to pay Plaintiff accumulated vacation and holiday time in violation of the terms of the collective bargaining agreement between Plaintiff's union and the Town of Clarkstown. *See* Am. Compl. ¶¶ 177–191.

New York courts have held that "[a] union member has no individual rights under a collective bargaining agreement which he can enforce against his employer except through the union." *Rine v. Higgins*, 244 A.D.2d 963, 965 (N.Y. App. Div. 1997) (citing *Berlvn v. Board of Education*, 80 A.D.2d 572, 573, aff'd 55 N.Y.2d 912 (N.Y. 1982)). "[W]here a collective bargaining agreement clearly sets forth a grievance procedure as a condition precedent to commencing an action for claims based upon specific provisions of the agreement, that procedure must be followed." *Sasso v. City of Yonkers*, 213 A.D.2d 392, 393 (N.Y. App. Div.1995) (citing *Matter of Board of Education v. Yonkers Federation of Teachers*, 81 A.D.2d 585). However, "even where the agreement does contain such a restriction on civil suits, plaintiffs may proceed where they can demonstrate that the union failed to adequately represent their interests." *Lee v. City of Syracuse*, No. 03 Civ. 1329, 2005 WL 6779366, at *6 (N.D.N.Y. Feb. 15, 2005) (citing *Rieder v. State University of New York*, 47 A.D.2d 865 (N.Y. App. Div. 1975).

The collective bargaining agreement at issue in this case sets forth a grievance procedure as a condition precedent for bringing claims arising under the agreement. Defs.' Ex. K. Defendants contend that they are entitled to summary judgment on Plaintiff's state law claims because Plaintiff "does not allege that his union failed to adequately represent his interests" and "does not deny that he failed to proceed to arbitration in accordance with Article X of his Labor Contract." Defs.' Mem. at 22. Defendants are incorrect. In his Amended Complaint, Plaintiff alleged that he "requested that his union pursue a grievance and claim on his behalf . . . and his union has refused to do so." Am. Compl. ¶ 184. Moreover, Plaintiff's declaration in connection with his opposition to the instant motion describes conversations Plaintiff had with representatives of the union in which the representatives declined to pursue Plaintiff's claim.

Pl.'s Ex. 21 ¶¶ 14, 15. Thus, material issues of fact exist regarding whether Plaintiff is entitled to bring claims arising under the collective bargaining agreement on the ground that his union refused to pursue his grievances. Accordingly, Defendants' motion for summary judgment on Plaintiff's state law claims is DENIED.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The parties are directed to appear for a status conference on October 6, 2017 at 11:30am at the United States Courthouse, 40 Foley Square, Courtroom 619, New York, NY 10007. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 88.

It is SO ORDERED.

Dated: September 15, 2017
New York, New York

Edgardo Ramos, U.S.D.J.
United States District Judge